UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:15-CR-00046 (VAB) |
| | : | |
| v. | : | |
| | : | |
| DAJUHN GRIFFIN, a.k.a. "Dey Dey" | : | January 25, 2016 |

## THE GOVERNMENT'S SENTENCING MEMORANDUM

This memorandum is submitted in aid of the defendant Dajuhn Griffin's sentencing scheduled for January 28, 2016. Dajuhn Griffin (hereafter the "Defendant" or "Griffin") pleaded guilty to Interference with Commerce by Robbery based on his role in the smash-and-grab robbery of Sidney Thomas Jewelers in Stamford, Connecticut in November 2014. Griffin travelled to Connecticut with several accomplices solely for the purpose of robbing Sidney Thomas Jewelers, located in the Stamford Town Center Mall. During the robbery, Griffin, along with two accomplices, walked into the store during business hours, smashed open display cases with hammers, and took over $250,000 worth of Rolex watches. They carried out this bold robbery in the presence of store employees and at the start of the busy holiday season.

Given the seriousness of the offense, Griffin's troubling criminal history, and the need for the sentence imposed to deter the defendant and others from committing similar crimes, promote respect for the law, and provide just punishment, the Government respectfully requests a sentence of 52 months' imprisonment followed by three years of supervised release.

**I.     BACKGROUND**

    A.     Procedural Background

Griffin was arrested on April 6, 2015 pursuant to a federal warrant issued following return of a two count indictment charging him with Interference with Commerce by Robbery, in violation of Title

18, United States Code, Section 1951(a) (Count One) and Interference with Commerce by Robbery, in violation of Title 18, United States Code, Section 1951(a)(1) and 2 (Count Two).  Both counts carry a maximum penalty of twenty years' imprisonment and a $250,000 fine.  On September 4, 2015, Griffin pleaded guilty to Count Two of the Indictment.

    B.    Offense Conduct[1]

In summary, during the early morning hours of November 26, 2014, Griffin gathered with several co-defendants, including Brian Moore and Richard Bailey, and travelled together overnight in a rented vehicle from Detroit, Michigan to Stamford, Connecticut.  The group travelled to Stamford for the sole purpose of carrying out a pre-planned robbery of Rolex watches from Sidney Thomas Jewelers.

After arriving in Stamford, Griffin and others surveyed the area and identified a resident's Jeep SUV to steal in order to use to travel to the mall and avoid drawing attention to the rental vehicle.  They broke into the jeep, hotwired the ignition, and then Griffin, Bailey, and one other accomplice drove the jeep to the Stamford Town Center Mall while the rest of the crew remained behind in the getaway vehicle.[2]

At approximately 5:50 p.m., Griffin, Bailey, and a third accomplice entered Sidney Thomas Jewelers.  Store video surveillance shows that the three walked directly toward a set of display cases containing Rolex watches, took out hammers, and began striking the protective glass tops of the display cases.  After smashing the top panel of one of the cases, they peeled back the protective glass and took fifteen Rolex watches from within.

---

[1] Griffin's offense conduct is set forth in further detail in the Pre-Sentence Report ("PSR").

[2] Following the robbery, police found the stolen jeep left running in the garage of the mall with its ignition torn out.

-2-

Several employees were inside the store at the time. Upon hearing the loud smashing and observing what was taking place, the employees retreated out of fear for their safety.[3] A mall security guard was also present outside the store during the robbery. According to the security guard, he became suspicious when the group first passed by him and entered the store. One of the suspects said "what's up" to him and had his hand concealed in his pocket in a way that caused concern and suggested he may have had a weapon. Once the guard saw the robbery begin, he requested back up and notification of the Stamford Police Department. He also moved away from the store entrance out of concern for his safety.

Shortly after grabbing the watches from the smashed display case, Griffin, Bailey, and the other male fled from the store into the mall atrium and ran in different directions. One of the suspects ran by the same security guard who had been standing near the entrance before the robbery. As the suspect passed, he had his hand in his pocket and uttered "go ahead," which the security guard perceived as a taunt and indication that he may have had a weapon concealed.

Two of the suspects escaped out mall exits. A third suspect, later identified as Bailey, attempted to run up an escalator. Another security guard grabbed and subdued him after a brief struggle. A search revealed that he had several Rolex watches in his possession. Bailey was taken to a security area and placed under arrest by members of the Stamford Police Department.

Sidney Thomas Jewelers indicated that the total value of the watches removed from the display case was $254,300. Of the fifteen watches, eight – including those taken by Griffin – have never been recovered. Seven were recovered, each of which remain in evidence. Five of the recovered watches were found on Bailey. Two were dropped and damaged while the suspects fled. Store display cases

---

[3] One of the store employees, when later interviewed by a Special Agent with the Federal Bureau of Investigation ("FBI"), reported that she was terrified for her and others' safety and that she experienced a panic attack as a result of the robbery.

were also heavily damaged during the robbery, *see* Exhibit A, Crime Scene Photographs from Sidney Thomas Jewelers, and the store experienced a disruption in its business.

Following the robbery, the FBI obtained information implicating Griffin. Historical records from Griffin's cellular telephone showed that he communicated with co-defendants several times on November 26, 2014. In addition, his cellular telephone made contact with communication towers along the same path of travel as co-defendants from Detroit, Michigan to Stamford, Connecticut and back, including within the immediate vicinity of the Stamford Town Center Mall around the time of the robbery.

During the ensuing investigation, the FBI obtained a search warrant for a Facebook page maintained by Griffin under the name "Ymf Ceo Cash."[4] On November 27, 2014, the day after the robbery, Griffin posted the following message on his Facebook page: "FREE SCARFACE RICHIE…REAL NIGGAS HOLD UP BITCH NIGGAS FOLD UP." The FBI knew through information obtained in the course of its investigation that "Scarface Richie" is the name of Griffin's accomplice who was apprehended immediately after the robbery. Agents interpreted the message as an attempt to dissuade co-defendant Bailey from admitting his involvement in the robbery or providing any information about it to authorities. Investigators also observed that Griffin's Facebook page featured "Likes" including Facebook groups called "Watch Boss" and "Rolex Passion" and a photo of himself holding a large amount of cash.

Griffin was arrested on April 6, 2015. Following his arrest, Griffin waived his *Miranda* rights and consented to an interview, during which he acknowledged participating in the robbery of Sidney Thomas Jewelers. Griffin also admitted that he had accompanied the same crew to Georgia to carry out another planned robbery, which he said had not ultimately occurred.

---

[4] Griffin also has a tattoo bearing the acronym "YMFCEO." "YMF" stands for "Young Mafia Family." PSR ¶ 15.

C. Guidelines Calculation

1. Offense Conduct

The parties agree that Griffin's base offense level under U.S.S.G. § 2B3.1(a) is 20. Three levels are added because dangerous weapons, here hammers, were possessed and brandished during the robbery, U.S.S.G. § 2B3.1(b)(2)(E), and two levels are added because the loss resulting from the robbery exceeded $95,000, U.S.S.G. § 2B3.1(b)(7)(C).[5] After subtracting three levels for acceptance of responsibility, under U.S.S.G. § 3E1.1, Griffin's total adjusted offense level is 22.

2. Criminal History

Griffin falls within Criminal History Category III[6] based on the following two convictions and sentences imposed in Michigan: (1) Armed Robbery, on or about May 19, 2010, for which he was sentenced to 1 year placement and 2 years' probation, which accrues 2 criminal history points, U.S.S.G § 4A1.1(b) and (d)(2)(A) (PSR ¶ 33); and (2) Carrying a Firearm without a Permit, following his arrest on June 19, 2010, for which he was sentenced to 1 year placement, which accrues 2 criminal history points, U.S.S.G § 4A1.1(b) and (d)(2)(A) (PSR ¶ 34).

According to the Defendant's Memorandum in Aid of Sentencing, Griffin indicated to defense counsel that he "has no knowledge or recollections of these allegations." Def. Sentencing Memo. at 2. Griffin's mother also advised that she "can only recall a single arrest." *Id*. These facts appear to have led defense counsel to believe that "[i]t appears likely that these charges are not associated with Mr.

---

[5] The Guidelines calculation set forth in the plea agreement was based on the preceding version of the Guidelines, which provided for an additional one level enhancement for losses over $250,000. The calculation set forth in this memorandum is based on the Guidelines manual presently in effect, which calls for a two rather than three level enhancement for losses between $95,000 and $500,000.

[6] The parties initially calculated Griffin's criminal history as CHC I based on the limited information available at the time the plea agreement was prepared. Probation has since uncovered additional information about juvenile convictions which impacts Griffin's criminal history score. As set forth in the plea agreement, "[t]he parties reserve the right to recalculate the defendant's Criminal History Category and corresponding sentencing ranges if this initial assessment proves inaccurate."

Griffin who has no recollection of being arrested or prosecuted in the juvenile court for these offenses." *Id.*

An examination of the police reports obtained by Probation reveals numerous arrests for robbery, firearms offenses, and drug offenses, all of which are clearly associated with the Defendant, Dajuhn Griffin. The reports variously cite his date of birth, the home address on record with Probation and the FBI in the instant case, and Griffin's nickname "Dey Dey." There is simply no question that the Defendant in this case – Dajuhn Griffin, a.k.a. "Day Day" (phonetic spelling) – is the same Dajuhn Griffin who was convicted of the above-referenced offenses and who is identified throughout the nearly 60 pages of police reports obtained by Probation.[7]

The police report dated April 27, 2010, which details the events underlying Griffin's armed robbery conviction, describe circumstances wherein a male, later identified as Griffin, approached the victim, asked for some "weed," brandished a handgun, threatened to shoot the victim, and then robbed him of cash and a cell phone. Soon after, police were able to track down the suspect, who they identified as Griffin. Upon search, they found a handgun in Griffin's jacket pocket. *See* PSR ¶ 33; *see also* Sealed Exhibit C.

Police reports obtained by Probation also describe the events which led to Griffin's conviction for carrying a firearm. According to those reports, dated June 19, 2010, officers observed a group of males loitering on the porch of an unoccupied dwelling. Upon approach, an officer observed one of the males, later identified as Griffin, remove a handgun from his waistband and drop it onto the grass while walking away from approaching officers. Officers recovered the weapon, which was a .45

---

[7] In addition, although Griffin's mother indicated to defense counsel that she could only recall one arrest, she told Probation that Griffin "was incarcerated in a juvenile detention facility for three months on one occasion and approximately eight months on a second occasion." PSR ¶ 54.

caliber handgun.  Officers arrested Griffin and took him to a juvenile facility.  PSR ¶ 34; *see also* Sealed Exhibit C.

Additional police reports obtained by Probation indicate that Griffin has been arrested or investigated on several other occasions for weapons offenses, a drug sale, theft, disruptive conduct in his high school, and allegations of threatening.

For example, a police report dated April 22, 2010 details Griffin's alleged involvement in a shooting occurring days before his arrest for armed robbery.  The events described in the police reports are strikingly similar to the police report relating to Griffin's robbery conviction.  In the April 22, 2010 report, officers described a complaint wherein three males approached the victim and asked him if he wanted to "buy some weed."  The victim reported hearing the action of a gun cocking.  In response, he fled.  While running away, he heard several gunshots.  An employee at a nearby store also heard gun shots and witnessed two males fleeing afterwards.  Griffin was later identified as a suspect.  According to the report, police later confronted Griffin when he was arrested for armed robbery about his alleged involvement in the shooting.  Upon questioning, Griffin admitted firing several shots at the victim, purportedly to scare him.  The disposition following this arrest is unknown.  *See* PSR ¶ 41; *see also* Sealed Exhibit C.

Griffin was arrested on weapons charges again in 2013.  According to the police report dated May 13, 2013, uniformed officers encountered a group of males standing in the middle of the street talking to another group of males in a Ford Focus.  As officers approached in their vehicle, one of the officers heard someone yell "Hey, the Hook!" and observed a passenger of the vehicle, later identified as Griffin, look back and remove something from what appeared to be the waistband area of his clothing.  Griffin then quickly exited the vehicle, announced that he was "on probation for robbery,"

and stated that he did not know anything about the vehicle. Officers smelled a strong odor of marijuana and observed that Griffin appeared nervous. Upon search of the vehicle, officers located a loaded Colt .357 handgun on the passenger side floor board. Griffin was placed under arrest. Two of the males in the vehicle were also arrested on active warrants. The disposition of this case is also unclear. *See* PSR ¶ 42; *see also* Sealed Exhibit C

According to other police reports, Griffin has also been arrested on drug related charges. For example, a report dated October 21, 2014 identifies Griffin as an arrestee for possession and sale of crack cocaine. According to the report, he allegedly sold a quantity of crack cocaine to a passenger in a car at a gas station where police were conducting surveillance. *See* PSR ¶ 43. Another report dated January 27, 2015 details a complaint involving allegations of threatening by Griffin against a female who had information about a murder which took place in 2013. *See* PSR ¶ 38. Although no direct threats were attributed to Griffin, the victim's mother was concerned enough that she wanted a police report on file in case anything were to happen. Griffin was also implicated and arrested in connection with the theft of a moped years before in 2008. *See* PSR ¶ 40. The PSR details other instances where Griffin has been the subject of complaints and arrests.

        3.      <u>Guidelines Calculation</u>

A total offense level of 22 and a Criminal History Category III results in an advisory guidelines range of 46 to 57 months (sentencing table) and a fine range of $15,000 to $150,000 (U.S.S.G. § 5E1.2(c)(3)). The Defendant is also subject to a supervised release term of at least one but not more than three years under U.S.S.G. § 5D1.2.

        D.      <u>Restitution</u>

In addition to the other penalties provided by law, the Court must order that the Defendant

make restitution under 18 U.S.C. § 3663A. *See also* U.S.S.G. § 5E1.1. As set forth in the plea agreement, Griffin will be jointly and severally liable with his co-defendants for restitution.

At this time, the Government is still gathering documentation from the insurer of Sidney Thomas Jewelers – Lloyd's of London – which paid out an insurance claim for amounts exceeding the policy deductible. The Government anticipates receiving this information soon. Accordingly, the Government respectfully requests a continuance of a date for determining restitution to a time not exceeding 30 days following sentencing. *See* 18 U.S.C § 3664(d)(5).

## II. GOVERNING LAW

Although application of the United States Sentencing Guidelines is no longer mandatory, *see United States v. Booker*, 543 U.S. 220 (2005), in each case, "the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a)" in arriving at a reasonable sentence. *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements."). Thus, the sentencing court must now first determine the applicable Guidelines range (including any departures), and thereafter, determine whether in light of the Guidelines and the other factors listed in section 3553(a), there is any reason to impose a non-Guidelines sentence. As the Second Circuit explained, "*Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *Crosby*, 397 F.3d at 113. Both the Supreme Court and the Court of Appeals expect "sentencing judges faithfully to discharge their statutory obligation to 'consider' the Guidelines and all of the other factors listed in section 3553(a), . . .

. and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice." *Crosby*, 397 F.3d at 113-114.

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B) to afford adequate deterrence to criminal conduct;

   (C) to protect the public from further crimes of the defendant; and

   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In *United States v. Crosby*, 397 F.3d at 111-13, the Second Circuit explained that, in light of *Booker*, district courts should now engage in a three-step sentencing procedure. First, the district court must determine the applicable Guidelines range, and in so doing, "the sentencing judge will be entitled

to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Crosby*, 397 F.3d at 111-12; *see also United States v. Salazar*, 489 F.3d 555, 557 (2d Cir. 2007) (post-*Booker* district courts maintain a statutory obligation to consider the Guidelines).  Second, the district court should consider whether a departure from that Guidelines range is appropriate.  *Crosby*, 397 F.3d at 112. Third, the court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to be imposed.  *Id.* at 112-13; *see also United States v. Salazar*, 489 F.3d at 557 (holding, "the discretion afforded district judges by *Booker* applies to their consideration of the Guidelines range as one of the § 3553(a) factors *after* that range has been calculated") (emphasis in original).  The fact that the Sentencing Guidelines are no longer mandatory does not reduce them to "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."  *Crosby*, 397 F.3d at 113.  A failure to consider the Guidelines range and to instead simply select a sentence without such consideration is error.  *Id.* at 115; *see also United States v. Cuevas*, 496 F.3d 256, 265 (2d Cir. 2007) (explaining district courts have a duty "to consider the applicable Guidelines range, in addition to the other factors listed in 18 U.S.C. § 3553(a), in determining the appropriate sentence").

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court explained that "[b]ecause the Guidelines are now advisory, appellate review of sentencing decisions is limited to determining whether they are 'reasonable' [citation omitted] and an abuse of discretion standard applies. . . ." *Gall*, 552 U.S. at 45.  Further, a district judge "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts of the case." *Id.*  In so doing, the sentencing judge "must consider the extent of any departure from the Guidelines and must explain the appropriateness of any unusually lenient or harsh sentence with sufficient justifications." *Id.*

**III.     DISCUSSION**

The Government respectfully requests that the Court sentence Griffin to a term of incarceration of 52 months, which is within the applicable guidelines range, followed by a three year term of supervised release.  The Government believes a sentence within the applicable guidelines range is appropriate in light of the seriousness of the offense, the Defendant's troubling criminal record, and the need for the sentence imposed to deter the Defendant and others from committing similar crimes, promote respect for the law, and provide just punishment.  The Government does not seek imposition of a fine; it does, however, intend to seek restitution.

   A.     Seriousness of the Offense

The instant offense is extremely serious.  Griffin is responsible for carrying out a smash-and-grab robbery which resulted in significant losses to Sidney Thomas Jewelers.  Together with his accomplices, Griffin took over $250,000 dollars' worth of Rolex watches.  In addition, they heavily damaged expensive display cases inside the store and disrupted business during one of the busiest weeks of the holiday shopping season.

These losses are not easily absorbed.  They have a real and significant impact on owners, investors, and employees.  Brick-and-mortar stores like Sidney Thomas Jewelers frequently have high insurance deductibles (here $50,000) and depend heavily on sales made in November and December.  Furthermore, crimes such as the robbery carried out by Griffin and his accomplices have additional economic impacts that are harder to quantify but no less significant in the long run.  They deter future business by discouraging shoppers from visiting malls and other down-town shopping centers out of concerns for safety.  They also increase insurance costs for the industry as a whole.  In an era of

increased competition from online retailers and suburban vendors, these impacts can be especially difficult to bear.

The human impact of this robbery and the risks posed by it are also significant. Griffin and his accomplices terrified store employees and demonstrated a gross disregard for their safety and for the safety of the public. What would have happened had the security guard or a bystander intervened? Would Griffin or one of his accomplices – perhaps whoever taunted the security guard to "go ahead" – have bludgeoned him or her in response? What if the police had seen the getaway van? Would a dangerous pursuit through densely populated downtown Stamford have ensued? Griffin readily accepted these risks.[8] In addition, a store employee reported being "frightened and fearful for their safety" to the extent that she suffered a panic attack during the robbery. PSR ¶ 8. While she and others were fortunate to be spared physical injury, this experience no doubt will leave lasting effects. In addition, Sidney Thomas reports losing employees following the robbery and having prospective employees refuse to work at the Stamford location as a result of it.

Griffin should know well the enduring negative impact fear and violence has on a person as he himself has been a victim of violent crime. At age 13, he was shot twice, and two years ago, he was stabbed and slashed during an altercation. PSR ¶¶ 48, 49. Notwithstanding his own experiences as a victim, Griffin subjected others to a significant risk of harm and fear purely to enrich himself at their expense.

The sophisticated planning behind the robbery and bold manner of its execution also highlights the seriousness of the offense. Although appropriately described as a "smash-and-grab" robbery, the

---

[8] These risks were more than a hypothetical possibility. Griffin and his accomplice Bailey have criminal pasts that demonstrate a propensity for violence. As discussed above, Griffin criminal history involves use of force for robbery and multiple instances of illegal possession of firearms. His accomplice Bailey, who entered the store with him, has also been convicted of robbery and carrying a concealed weapon without a permit.

term does not adequately capture the sophistication employed here.  Griffin and his accomplices identified Sidney Thomas Jewelers in advance based on the store's status as a distributor of Rolex Watches located far away from Detroit.  They then rented a van and travelled over 1,200 miles round-trip from Detroit in order to reach the store.  And once there, Griffin and others broke into a Stamford resident's SUV, hotwired the ignition, and used that vehicle instead of their rented getaway van to travel to the mall and carry out the robbery.  These measures – many of which were intended to hinder subsequent investigation – show criminal sophistication and know-how.  They are hallmarks of a group skilled in committing crimes.  But for the quick response on the part of the Stamford Police Department and extensive efforts invested by the FBI, Griffin and others might have succeeded in avoiding apprehension.

In light of the seriousness of the offense as demonstrated by its economic and human impact as well as the apparent sophistication, a significant sentence within the applicable guidelines range is warranted.

      B.      <u>History and Characteristics of the Defendant</u>

At 20 years-old, Griffin is still a young man.  No doubt, he has lived a challenging life as a result of growing up in Detroit, surrounded by poverty and crime.  As detailed in the PSR, he has been a victim of violence on several occasions, and the difficulties of his family situation while growing up are apparent.  Griffin's young age presents him with a rare opportunity to change his life going forward. Under the likely scenarios Griffin may face at sentencing before this Court – and even with imposition of a stringent sentence – he will see through the consequences of his actions with many decades of life ahead. Recent indications from his time on pre-trial release suggest he may be moving in a positive direction, but this limited stretch does not change the fact that when faced with such

opportunities in the past, he has reoffended time and time again. Moreover, his path ahead will be made more difficult by his limited education and the nature of his criminal history. Griffin was expelled in high school because, by his own admission, he was "too busy running the streets." PSR ¶ 53. Even beyond his criminal history, other aspects of his personal background suggest an enduring infatuation with crime. He has tattoos on his body indicative of gang membership. Written on his left arm is the name of a Detroit gang – "Red Wings Mafia"[9] – along with a depiction of a ski mask and the letters "YMF," which stands for "Young Mafia Family." As a further homage to this lifestyle, Griffin has "Live by the Code" tattooed across his abdomen. As evidence of what this "Code" entails, the day after the robbery Griffin directed the following Facebook message to his accomplice who was captured: "FREE SCARFACE RICHIE…REAL NIGGAS HOLD UP BITCH NIGGAS FOLD UP." And as noted earlier, Griffin's Facebook page also features likes of groups called "Watch Boss" and "Rolex Passion" and a photo of himself holding a large amount of cash.

Taken together, these all point to a disturbing personal identification with a life of crime and the easy money occasionally afforded by it at others expense. While it is never too late to make positive changes, Griffin comes before this Court with a troubled background and a history that, since his adolescence, has been marked with criminal conduct and violence.[10] These factors militate in favor of a stringent sentence. They do not warrant the leniency he seeks.

      C.      <u>Need to Avoid Unwarranted Disparities</u>

Only one defendant in this case has been sentenced to-date. On November 23, 2015, the Court sentenced co-defendant Brian Moore to 48 months' imprisonment. The sentence urged here by the

---

[9] Notably, the "Red Wing Mafia" has been investigated by the FBI and implicated in other similar smash-and-grab robberies in the past.

[10] Griffin's statements to defense counsel denying that he was the person involved in the arrests and convictions identified by Probation, *see* Def. Sentencing Memo. at 2, also call into question his candor and suggest that he continues to seek ways to avoid taking responsibility or his actions.

Government – 52 months' imprisonment – is slightly above the sentence imposed in Moore's case, but it is justified by Griffin's comparatively more significant criminal history. Although Moore was an organizer in the robbery, he fell within Criminal History Category I. Not only was Moore's criminal history less extensive, but it also lacked some of the aspects that make Griffin's so troubling, namely repeated instances of unlawfully possessing firearms and robbery, both armed and unarmed. In light of Griffin's more extensive criminal history, a sentence of 52 months' is appropriate, and it would not amount to an unwarranted disparity.

> D. Goals of Federal Sentencing: Deterrence, and Need to Promote Respect for the Law, Provide Just Punishment, and Protect the Public

Although young, Griffin's criminal history stretches back into his early teenage years and reveals a persistent involvement in serious criminal conduct. As detailed above, *supra* pp. 5-8, Griffin has been convicted at least twice and served time as a juvenile for armed robbery and carrying a firearm without a permit. *See also* PSR ¶¶ 33-34. He has been arrested several other times for carrying firearms, unarmed robbery, and drug offenses. In addition, he has been the subject of investigation for threatening and other criminal conduct. The facts detailed in the police reports paint a grim picture. Notwithstanding prior convictions and periods of incarceration, Griffin has persisted in committing serious crimes. The instant offense marks an upward trend in his criminal history. As serious as his prior instances of armed robbery and weapons possession are, Griffin's criminal activities now include interstate robbery involving over $250,000 in losses.

Griffin's criminal history, age, lack of education, and personal background all suggest that he presents a high risk of recidivism. In light of these factors, a stringent sentence is warranted in order to deter him from committing future crimes.

A stringent sentence is also needed to protect the public. As noted above, much of Griffin's criminal history, including the instant offense, involve taking others' property by force. In one instance in the past, he even admitted firing several shots at another person with a handgun. Thus, Griffin poses a persisting danger to the public. A lengthy period of imprisonment is warranted for this reason as well.

The goal of promoting respect for the law also justifies a sentence within the guidelines range. The bold nature of the robbery, which occurred during business hours and at the start of the holiday shopping season, illustrates a striking disrespect for the law. A stringent sentence of imprisonment within the range recommended by the guidelines is warranted to promote respect for the law in the future. The victims of Griffin's criminal conduct and the public at large also deserve a significant sentence to provide just punishment.

Finally, the goal of general deterrence is especially important here. Jewelry stores across the country witnessed a scourge of smash-and-grab robberies in 2014.[11] Many of these track back to robbery crews composed of multiple individuals based in and around Detroit. In aggregate, these robberies have resulted in millions of dollars in losses for businesses throughout the country. This is a prevalent, serious, and continuing problem. A sentence within the guidelines range would send a pronounced deterrent message to others involved in carrying out robberies across the country and to persons who may be tempted to do so in the future.

---

[11] In 2014, jewelry stores experienced numerous smash-and-grab robberies, many of which have traced back to suspects and current defendants who reside in and around Detroit. According to FBI data, at least 20 such robberies took place across states such as Mississippi, Maryland, New York, Nebraska, Connecticut, North Carolina, Georgia, Pennsylvania, Wisconsin, Florida, Massachusetts, Michigan, and Indiana. Federal prosecutions are currently pending in Detroit relating to a number of these robberies, and investigations remain ongoing.

## IV. CONCLUSION

For the foregoing reasons, the Government believes that a sentence of 52 months' imprisonment, which is within the applicable guidelines range, followed by a three year term of supervised release, appropriately balances all of the sentencing factors and is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

                                              Respectfully submitted,

                                              DEIRDRE M. DALY
                                              UNITED STATES ATTORNEY

                                              */s/  Gabriel J. Vidoni*
                                              GABRIEL J. VIDONI
                                              ASSISTANT UNITED STATES ATTORNEY
                                              Fed. Bar No. phv07016
                                              450 Main Street – Room 328
                                              Hartford, CT 06103
                                              (860) 947-1101

**CERTIFICATION OF SERVICE**

   I hereby certify that on January 25, 2016, the foregoing Government's Sentencing Memorandum was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

            */s/  Gabriel J. Vidoni*
            GABRIEL J. VIDONI
            ASSISTANT UNITED STATES ATTORNEY